UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

IRON BRIDGE TOOLS, INC.                          CASE NO. 16-17505-RBR

    Debtor.                                      CHAPTER 11

_____/

IRON BRIDGE TOOLS, INC.,                         ADV PRO. CASE NO.

    Plaintiff,

v.

CARDINAL GROUP SERVICES, LLC,
DONALD RAMSEY, individually,
DAVID TURNER, individually,
AARON ETRA, individually,
EQUITY CAPITAL PARTNERS, LLC,
JALEEL LEWIS, individually, and
FREEMAN PERRY, individually,

    Defendants.

_____/

## COMPLAINT

Debtor in Possession, IRON BRIDGE TOOLS, INC. (hereinafter, known as "IBT,"
"Debtor" or "Plaintiff"), pursuant to Sections 541, 542, 544, 548 and 550(a) of Title 11 of the
United States Code (the "Bankruptcy Code"), Section 726.101 of the Florida Statutes,  Rule 7001
of the Federal Rules of Bankruptcy Procedure and other applicable state and federal law, files this
adversary complaint against Defendants, CARDINAL GROUP SERVICES, LLC ("CGS"),
DONALD RAMSEY, individually ("DR"), DAVID TURNER, individually ("DT"), AARON
ETRA, individually ("AE"), EQUITY CAPITAL PARTNERS, LLC ("ECP"), JALEEL LEWIS,
individually ("JL"), and FREEMAN PERRY, individually ("FP") (hereinafter CGS, DR, DT, AE,

ECP, JL and FP shall be collectively referred to as "Defendants") for damages, to avoid and recover certain avoidable transfers, and for other relief, and in support thereof, alleges as follows:

## THE PARTIES, JURISDICTION AND VENUE

1.     This Court has jurisdiction to hear and determine this matter, pursuant to 28 U.S.C. §§ 157(a) and 1334(b).

2.     This is a "core" proceeding pursuant to 28 U.S.C. § 157 (b)(2)(A), (E), (H) and (O). In the event this or any other appropriate Court finds any part of this proceeding to be "non-core," Debtor consents to the entry of final orders and judgment by the Bankruptcy Court in accordance with Fed. R. Bankr. 7008(a).

3.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409 because this proceeding arises under the Bankruptcy Code or arises in or is related to a case pending under the Bankruptcy Code pending in this District.

4.     On May 25, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

5.     The Debtor is operating its business as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.  No trustee, examiner or official committee of unsecured creditors has been appointed to date.

6.     Plaintiff, IBT is a Florida corporation, duly registered with a principal place of business located in Broward County, Florida.  IBT manufactures and wholesales hand tools with operations in Florida, Georgia, California, Canada and China.  IBT manufactures for major retailers and designers such as Home Depot, Skil, OVC, Best Buy, Target, OSH, Advance Auto Parts, ROSS, Carquest among others.

7.     Defendant, CGS is a Nevada Limited Liability Company, whose principal place of

business is located in New York, New York.

8. Defendant, DR is an individual, who is otherwise *sui juris* and who upon information and belief resides in Alexandria, Virginia. DR is a Manager/Director/Officer of CGS.

9. Defendant, DT is an individual, who is otherwise *sui juris* and who upon information and belief resides in Los Angeles, California. DT is a Manager/Director/Officer of CGS.

10. Defendant, AE is an individual, who is otherwise *sui juris* and who upon information and belief resides in New York, New York.

11. Defendant, ECP is a Delaware Limited Liability Company, whose principal place of business is located in New York, New York.

12. Defendant, JL is an individual, who is otherwise *sui juris* and who upon information and belief resides in New York, New York. JL is a Manager/Director/Officer of ECP.

13. Defendant, FP is an individual, who is otherwise *sui juris* and who upon information and belief resides in New York, New York. FP is a Manager/Director/Officer of ECP.

14. All conditions precedent to the bringing of this action and the attaching of jurisdiction have been performed, waived or excused.

## FACTS COMMON TO ALL COUNTS

15. Prior to November, 2015, IBT had conversations with CGS. These conversations were held between Glenn Robinson on behalf of IBT, and DR and DT on behalf of CGS. There were multiple conversations, emails and texts exchanged between the parties.

16. As of November 2015, IBT had secured an agreement from Hanmi Bank, N.A. to provide a commercial loan to IBT in the amount of fifteen million dollars ($15,000,000.00). One of the conditions of the commercial loan was the provision of a stand-by letter of credit for fifteen

million dollars ($15,000,000.00) ("SBLC") from a list of approved banks.

17.     After numerous communications between IBT and CGS, CGS agreed to provide the SBLC on certain terms and conditions. The agreement between IBT and CGS was embodied in an escrow agreement ("Escrow Agreement") and an attached agreement to provide the SBLC ("SBLC Agreement"). A copy of the executed Escrow Agreement and incorporated SBLC Agreement are attached hereto and made a part hereof as Composite Exhibit "A."

18.     DR and DT induced IBT to enter into the Escrow Agreement and SBLC Agreement by making the following representations:

        a.  They had the instrument lined up and ready to go;

        b.  All basic due diligence was completed and IBT was approved by their provider; and,

        c.  The source of the underlying funds was a "hedge fund," (later established to be ECP), who was represented to have hundreds of millions of dollars.

19.     Despite a stated effective date of November 4, 2015, it was not until November 10, 2015 that the Escrow Agreement and SBLC Agreement were finally and fully executed. By that same day, the full $450,000.00 was received from Iron Bridge (the "Transfer") and $5,000.00 was received from Cardinal [CGS]? to pay the escrow agent's fee. A copy of the email of November 10, 2015 from AE providing his signature and acknowledging receipt of the monies including the Transfer, is attached hereto and made a part hereof as Exhibit "B."

20.     As of November 18, 2015, CGS had still not performed. Counsel for IBT wrote to the Defendants, as follows:

> Gentlemen:
> It is now almost the close of business on Wednesday, East Coast time. I understood that by this time we would have completed the banking due diligence and Hanmi would have informed me that AML, KYC and NCO had

been completed.  We would have also anticipated receiving the pre-advice by this time.  I must now respectfully demand that I be put in contact with opposing counsel to address the status of the deal.  We are running short on time and need to understand the intentions of the Hedge Fund.  Presuming that Cardinal and the Hedge Fund have counsel, please do not respond substantively to me directly, but please ensure that I receive contact information for counsel immediately.  I have also copied the escrow agent on this email as a matter of course, but understand he does not represent Cardinal and is away until Friday in any event.

21.     The following day, in response to a request by DT for additional information, on

November 19, 2015, counsel for IBT wrote to DT with copies to the other Defendants, as follows:

Mr. Turner:

While several of the "facts" stated in your email are simply not true, I understand that much of this information was relayed to you by the others on this email chain. I am a practical man, and as such, there is no need to discuss how we arrived at the current position; only if we can move forward from this point. Note that, I have been in the loop since the very beginning and am both an officer and authorized signature for Iron Bridge Tools, Inc.  Here is the situation from my end:

1.    Hanmi Bank has rescheduled the closing from November 16, 2015 to November 25, 2015.

2.    Hanmi has indicated to me that it does not use formal bank commitments and instead goes from an LOI directly to a loan agreement.  I can represent to you that the "draft" you were exhibited was negotiated and agreed with Hanmi and "blessed" by their outside closing counsel who has been retained for this transaction since the drafting of the loan agreement.

3.    Iron Bridge has responded to all of Hanmi's requests and satisfied same as of today, with the exception of any issues surrounding the SBLC.

4.    We now have five (5) banking days to receive the instrument, and my only concern is how do we accomplish this in a timely manner.

If you prefer to have the communication without all of the other parties involved then I am sure we can talk directly and there will be no objection.

While I understand you may not have any new information, I must raise one issue. Please advise me what steps we may take to get the KYC, AML and NCO documentation to Hanmi as this is of paramount importance to Hanmi and is presently a pressing concern.

In addition, I have been a lawyer for a substantial period of time, (although not as long as the esteemed Mr. Etra) and I am available to certify any of the facts concerning the relationship between Iron Bridge and Hanmi; so, if the subject Hedge Fund has any concerns, I can belay those as necessary.

And again, please feel free to communicate with me directly if you prefer. My contact information is below and my cell phone is xxx-xxx-xxxx.

22.     After several more days went by and there was nothing beyond superfluous conversations, on November 23, 2015, IBT through its counsel questioned the whereabouts of the escrow [Transfer] via phone call and follow-up email to Mr. Etra, as follows:

> Aaron:
> I remain perplexed by our conversation and your indication that you are a neutral and cannot share information. Further confusing is your below-reference to paragraph 5 of the escrow agreement, which only becomes relevant once the SBLC is issued. So in an effort to alleviate any concerns, I will be abundantly clear:
> 1.    The Escrow Agreement provides the $450k Initial Deposit will be held in escrow pursuant to the SBLC Agreement;
> 2.    The SBLC Agreement provides:
> "The Initial Deposit shall remain in attorney escrow custody until the SBLC is delivered to received, verified, and authenticated at the banking coordinates that IRON BRIDGE shall specify to CARDINAL in writing, at which time the Initial Deposit shall be deemed earned and non-refundable. In the unlikely event that the SBLC does not issue, the Initial Deposit shall be returned by escrow attorney to IRON BRIDGE less any reasonable banking fees, and costs that may have been incurred within 21-days from its receipt into the attorney escrow;"
> 3.    As you are aware, under 22 N.Y.C.R.R. Part 1200, Rule 1.15(c)(3), Iron Bridge Tools, Inc. must be rendered an "appropriate account" as to their Initial Deposit;
> 4.    Under 22 N.Y.C.R.R. Part 1200, Rule 1.15(d)(1)(iv), Iron Bridge Tools, Inc. must receive a "statement" if any funds were disbursed to them or on Iron Bridge's behalf.
> My sole inquiry is as to the account/statement indicating the location and disposition of the Initial Deposit of $450k.  No additional comment is necessary, so please advise me in accordance with the applicable rules.
> And to tell you the truth, I was not nervous until we spoke, so please belay my concerns.
> Thank you.

23.     Having failed to receive any substantive response, on November 30, 2015, IBT through its counsel, notified Defendants that the escrow [Transfer] was required to be returned to Iron Bridge, as follows:

> Gentlemen:
> I thought it prudent to email Mr. Etra, inasmuch as tomorrow is the twenty-first (21st) day from the completion of the initial deposit and the instrument has not issued.  Mr. Etra please advise where (absent us all extending the

escrow agreement tomorrow), you are intending to return the funds to Iron Bridge (in essence, please confirm you have proper wiring instructions on where to return the funds).

Mr. Etra, please advise us all accordingly.

In addition, in anticipation of the presumed need to execute updated documents tomorrow, what is everyone's availability throughout the day, eastern time?

Please let us all not delay in addressing this email, because the escrow agreement was written in such a way that there is no choice but for Mr. Etra to ensure that Iron Bridge receives the funds tomorrow. And if the escrow were to break, I fear for the viability of this transaction.

24.     On November 30, 2015, CGS, DR and DT confirmed that the funds would remain in escrow "until project completion." However, the project was never completed.

25.     On December 1, 2015, AE breached the terms of the escrow agreement by failing to return the funds to IBT as he was contractually and ethically bound to do.

26.     Between December 2, 2015 and December 17, 2015, CGS thwarted all attempts to verify the whereabouts of the escrowed funds. Then CGS, DR and DT informed IBT that it was backing out of the transaction, but that ECP was stepping in directly and would complete the deal. IBT was informed that JL and FP were the new points of contact.

27.     On December 17, 2015, an amendment to the agreement between CGS and IBT was partially executed; noting said agreement was never fully executed. A copy of the December 17, 2015 agreement is attached hereto and made a part hereof as Exhibit "C."

28.     Upon information and belief, the Defendants collectively, jointly and severally "walked-away" with the $450,000.00 that belonged to IBT. IBT has never received any documentation of the whereabouts of its funds, but DT and DR represented as follows:

    a.   DR and DT through CGS took $150,000.00;

    b.   $300,000.00 was given to ECP, JL and FP; and,

    c.   Even though it does not add up, AE was paid an additional $10,000.00 for his role

in releasing the escrow deposit.

29.     Leaving aside the issue of whether Exhibit "C" was ever properly executed, there are several issues with Exhibit "C" itself:

    a.  The amendment was never executed by ECP and ECP never agreed with the terms or otherwise performed the required actions;

    b.  AE as the Escrow Agent did not sign the document and as such, was not entitled to follow the instructions.  Note that AE provided in the Escrow Agreement in paragraph 8 that there could be no effective amendment without him being a party to the agreement; which in this case, he was not.  That language was provided by AE, not Iron Bridge;

    c.  Exhibit "C" does not even suggest that CGS would be receiving any funds;

    d.  Exhibit "C" does not alter the requirement that AE return all funds to IBT;

    e.  The language "ECP is requiring the funds issued under its Agreement with CARDINAL to be released forthwith, in order to secure assets to establish and cross collateralize the said credit facility," appears to refer to an agreement between ECP and CGS, but in any event, does not allow a release of any escrowed funds to anyone other than IBT; and,

    f.  Exhibit "C" provides that to the extent any funds would be required by ECP, they would within five (5) days, and before receiving any money, enter into a new escrow agreement with IBT; this was never done.

30.     Also notable is that AE in the Escrow Agreement agreed that any additional fees to him  were capped at $1,500.00 and then only as a condition to issue the SBLC; there was never any mention of his receiving $10,000.00.

31.    After several more weeks with nothing substantive being communicated, on February 2, 2016, CGS, DR, DT and AE informed IBT as follows:

     a.  Without any justification, CGD believed it was entitled to a "fee" of $450,000.00. CGS indicated to Iron Bridge that without further explanation, it paid $300,000.00 to the hedge fund (presumably ECP), but that it was "delighted" to have received $150,000.00 for doing absolutely nothing;

     b.  AE indicated to IBT that, "the last information I had was an indication that you and he had agreed on a revised application of the funds," without further explanation; and,

     c.  If the above were not enough, AE indicated he gratuitously paid himself an additional $10,000.00 of IBT funds, noting that under the Escrow Agreement, his fees were to be paid by CGS and were capped at an additional $1,500.00.

32.    IBT has not received its $450,000.00 of funds as demanded; nor has any explanation of the whereabouts of the funds been provided.

33.    No value has been received by IBT for the funds; to the contrary, the loss of use of the funds is largely responsible for the instant Chapter 11 filing by IBT.

34.    To the extent that DT and/or DR made representations to IBT (or omitted material facts from their discussions with IBT), or where DT and/or DR committed a tortious act (whether or not in the scope of their employment with CGS, such representations, omissions or tortious acts damaging IBT, DT and DR are personally liable for such damages to IBT, jointly and severally with CGS.

35.    To the extent that JL and/or FP made representations to IBT (or omitted material facts from their discussions with IBT), or where JL and/or FP committed a tortious act (whether

or not in the scope of their employment with ECP, such representations, omissions or tortious acts damaging IBT, JL and/or FP are personally liable for such damages to IBT, jointly and severally with ECP.

## COUNT I – AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS
### (Pursuant to 11 U.S.C. §§ 548 and 550)

36.     Plaintiff hereby re-alleges every allegation in paragraphs 1 through 35 as if fully set forth herein.

37.     This is an action to avoid and recover all or part of the Transfer as a fraudulent transfer made by the Debtor to Defendants pursuant to 11 U.S.C. §§ 548 and 550.

38.     Pursuant to §§ 544 and 548 of the Bankruptcy Code, the Debtor may avoid any transfer of an interest of the Debtor in property, or any obligation incurred by the Debtor, that was made or incurred on or within two (2) years before the date of the filing of the petition, if the debtor voluntarily or involuntarily

B.      (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

39.     Pursuant to 11 U.S.C. § 550, in a fraudulent transfer action commenced under 11 U.S.C. §§ 544 and 548, the debtor in possession may recover, for the benefit of the estate, the property transferred, or if the court so orders, the value of such property, from (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any

immediate or mediate transferee of such initial transferee.

40.     The debtor's November 10, 2015 transfer of $450,000.00 pursuant to the Escrow Agreement (previously defined, the "Transfer") constitutes a transfer of an interest in property of the Debtor to Defendants within two years prior to the Petition Date.

41.     The Debtor did not receive reasonably equivalent value for the Transfer and it: (i) was insolvent at the time of the Transfer or became insolvent as a result thereof; (ii) was engaged or was about to engage in a business or transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction; (iii) intended to incur, or believed or reasonably should have believed, that it would incur debts beyond its ability to pay as they came due; or (iv) made the Transfer for the benefit of various insiders of the Debtor.

42.     As a result of the Transfer, the Plaintiff has been damaged pursuant to 11 U.S.C. § 544(b) for the total value of the funds transferred.

43.     Pursuant to 11 U.S.C. § 550(a), to the extent all or a portion of the Transfer are avoided under 11 U.S.C. §§ 544(b) and 548, the debtor in possession is entitled to recover such transfers or the value of such property from the Defendant for whose benefit the Transfer was made, or as immediate or mediate transferee of an initial transferee of such Transfer.

**WHEREFORE**, Plaintiff, Iron Bridge Tools, Inc.  respectfully requests the entry of judgment against Defendants (i) avoiding the Transfer; (ii) ordering and directing the payment of a monetary award in the amount of the avoided Transfer, plus such additional amounts and property as may be discovered through these proceedings, together with accrued pre-judgment interest; (iii) ordering the payment of all costs and expenses incurred in regards to this action; (iv) disallowing any claim(s) Defendants may have against the Debtor until such time as Defendants pay the Transfer asserted herein pursuant to 11 U.S.C. § 502(d); and (v) granting any other and further

relief this Court deems just and proper.

## COUNT II – AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS
### (Pursuant to 11 U.S.C. §§ 544(b), 550(a) and Fla Stat § 726.105(1)(b))

44.     Plaintiff hereby re-alleges every allegation in paragraphs 1 through 35 as if fully set forth herein.

45.     This is an action to avoid and recover all or part of the Transfer as a fraudulent transfer made by the Debtor to Defendants pursuant to 11 U.S.C. §§ 544(b) and 550(a) and Fla. Stat. § 726.105(1)(b).

46.     Pursuant to 11 U.S.C. § 544(b), the Plaintiff may avoid any transfer of an interest of the Debtor in property or any obligation incurred by the Debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under 11 U.S.C. § 502(e).

47.     Florida Statute 726.105(1)(b) provides:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: without receiving        reasonably  equivalent in value in exchange for the transfer or obligation, and the debtor:

    (a)    was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

    (b)    intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

48.     The Transfer, and such additional funds and property as they may be discovered through these proceedings, constitute transfers of an interest in property of the Debtor and were made by the Debtor to Defendants.

49.     The Debtor did not receive reasonably equivalent value for the Transfer and it: (i) was insolvent at the time of the Transfer or became insolvent as a result thereof; (ii) was engaged or was about to engage in a business or transaction for which the remaining assets of the Debtor

were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed, that it would incur debts beyond its ability to pay as they came due.

50.     As a result of the Transfer, the Plaintiff has been damaged pursuant to 11 U.S.C. § 544(b) for the total value of the funds transferred.

Pursuant to 11 U.S.C. § 550(a), to the extent all or a portion of the Transfer are avoided under 11 U.S.C. §§ 544(b) and Fla. Stat. 726.105(1)(b), the Plaintiff is entitled to recover such transfers or the value of such property from Defendants for whose benefit the Transfer was made, or as immediate or mediate transferee of an initial transferee of such Transfer.**WHEREFORE**, Plaintiff, Iron Bridge Tools, Inc. respectfully requests the entry of judgment against Defendants (i) avoiding the Transfer; (ii) ordering and directing the payment of a monetary award in the amount of the avoided Transfer, plus such additional amounts and property as may be discovered through these proceedings, together with accrued pre-judgment interest; (iii) ordering the payment of all costs and expenses incurred in regards to this action; (iv) disallowing any claim(s) Defendants may have against the Debtor until such time as Defendants pay the Transfer asserted herein pursuant to 11 U.S.C. § 502(d); and (v) granting any other and further relief this Court deems just and proper.

## COUNT III – BREACH OF WRITTEN CONTRACT – CGS/AE/DT/DR

51.     Plaintiff hereby re-alleges every allegation in paragraphs 1 through 35 as if fully set forth herein..

52.     Exhibit "A" and Exhibit "C" comprise a written contract between IBT and CGS/AE.

53.     CGS and AE breached the contract by taking the $450,000.00 without basis and

proving nothing in return.

54.    IBT has been damaged by the actions of CGS/AE in an amount in excess of $15,000.00.

55.    DT and DR are jointly and severally liable for the actions of CGS.

WHEREFORE, Plaintiff, Iron Bridge Tools, Inc. respectfully requests the entry of judgment against CGS and AE and DT and DR (i) jointly and severally for damages in excess of $15,000.00; (ii) together with attorney fees as provided for in the Agreement, costs and interest; and (iii) granting any other and further relief this Court deems just and proper.

<u>**COUNT IV – FRAUDULENT MISREPRESENTATION – ALL DEFENDANTS**</u>

56.    Plaintiff hereby re-alleges every allegation in paragraphs 1 through 35 as if fully set forth herein..

57.    Plaintiffs sue Defendants for damages in excess of $15,000.00, exclusive of costs and interest, for fraudulent misrepresentation.

58.    DT and DR, individually and in their capacity as representatives of CGS, intentionally made false statements to Plaintiff as set forth above, or intentionally omitted relevant facts from their statements regarding the deal between the parties, their ability to perform under the contract, the funding capability of ECP and the integrity and safety of the $450,000.00.

59.    AE, individually, intentionally made false statements to Plaintiff as set forth above, or intentionally omitted relevant facts from his statements regarding the escrow between the parties, his ability to perform under the contract and the integrity and safety of the $450,000.00.

60.    JL and FP, individually and in their capacity as representatives of ECP, intentionally made false statements to Plaintiff as set forth above, or intentionally omitted relevant facts from their statements regarding the deal between the parties, their ability to perform under

the contract, the funding capability of ECP and the integrity and safety of the $450,000.00.

61.     Each of the individuals, individually and in their capacity as representatives of the respective entities, made representations to Plaintiff (or omitted material facts from their representations), which include, but are not limited to those set forth in paragraphs 41 through 43 above.

62.     Each of the individuals, individually and in their capacity as representatives of the respective entities, knew or should have known that their statements were false when they made them or knowingly omitted to tell the truth when they should have done so.

63.     Each of the individuals, individually and in their capacity as representatives of the respective entities, made the statements or omissions intending that Plaintiffs would rely on the false statements or omissions.

64.     Plaintiff did rely upon the statements or omissions of each of the individuals, individually and in their capacity as representatives of the respective entities, and has been damaged thereby.

WHEREFORE, Plaintiff, Iron Bridge Tools, Inc. respectfully requests the entry of judgment against Defendants, (i) jointly and severally, for damages in excess of $15,000.00; (ii) together with costs and interest; and (iii) granting any other and further relief this Court deems just and proper.Further, Plaintiff reserves the right to amend to assert punitive damages upon a proper showing to the Court.

### COUNT V – NEGLIGENT MISREPRESENTATION – ALL DEFENDANTS

65.     Plaintiff hereby re-alleges every allegation in paragraphs 1 through 35 and 58 through 60 as if fully set forth herein..

66.     Plaintiff sues Defendants for damages in excess of $15,000.00, exclusive of costs

and interest, for negligent misrepresentation.

67.    DT and DR, individually and in their capacity as representatives of CGS, made statements to Plaintiff as set forth above, or omitted relevant facts from their statements regarding the deal between the parties, their ability to perform under the contract, the funding capability of ECP and the integrity and safety of the $450,000.00, which statements Defendants may have believed were true at the time, but which statements were in fact false..

68.    AE, individually, made statements to Plaintiff as set forth above, or omitted relevant facts from his statements regarding the escrow between the parties, his ability to perform under the contract and the integrity and safety of the $450,000.00, which statements Defendant may have believed were true at the time, but which statements were in fact false..

69.    JL and FP, individually and in their capacity as representatives of ECP, made statements to Plaintiff as set forth above, or omitted relevant facts from their statements regarding the deal between the parties, their ability to perform under the contract, the funding capability of ECP and the integrity and safety of the $450,000.00, which statements Defendants may have believed were true at the time, but which statements were in fact false..

70.    Each of the individuals, individually and in their capacity as representatives of the respective entities, made representations to Plaintiff (or omitted material facts from their representations), which include, but are not limited to those set forth in paragraphs 41 through 43 above.

71.    Each of the individuals, individually and in their capacity as representatives of the respective entities, were negligent in making their statements because they should have known they were false when they made them.

72.    Each of the individuals, individually and in their capacity as representatives of the

respective entities, made the statements or omissions intending that Plaintiff would rely on the false statements or omissions.

73.     Plaintiff did rely upon the statements or omissions of each of the individuals, individually and in their capacity as representatives of the respective entities, and has been damaged thereby.

WHEREFORE, Plaintiff, Iron Bridge Tools, Inc. respectfully requests the entry of judgment against Defendants, (i) jointly and severally, for damages in excess of $15,000.00; (ii) together with costs and interest; and (iii) granting any other and further relief this Court deems just and proper.

## COUNT VI – CONVERSION – ALL DEFENDANTS

74.     Plaintiff hereby re-alleges every allegation in paragraphs 1 through 35 as if fully set forth herein..

75.     Plaintiff sues Defendants for damages in excess of $450,000.00, exclusive of costs and interest, for conversion.

76.     In accordance with the facts as set forth above, Defendants converted the $450,0000.00 belonging to Plaintiff to their own use.  It is unclear to Plaintiff, which Defendant actually wound up with the funds.

77.     Plaintiff was accordingly damaged in the amount of $145,000.00.

WHEREFORE, Plaintiff, Iron Bridge Tools, Inc. respectfully requests the entry of judgment against Defendants, (i) jointly and severally, for damages in excess of $15,000.00; (ii) together with costs and interest; and (iii) granting any other and further relief this Court deems just and proper.

## COUNT VII – CIVIL THEFT – ALL DEFENDANTS

78.    Plaintiff hereby re-alleges every allegation in paragraphs 1 through 35 as if fully set forth herein..

79.    Plaintiff sues Defendants for damages in excess of $15,000.00, exclusive of costs and interest, for civil theft under Fla. Stat. §772.11.

80.    In accordance with the facts as set forth above, Defendants, committed a theft of the $450,000.00 belonging to Plaintiffs as defined in Fla. Stat. §812.014.

81.    Plaintiff was accordingly damaged in the amount of $450,000.00.

82.    In accordance with Fla. Stat. §772.11, Plaintiff is entitled to threefold the actual damages sustained and reasonable attorney's fees and court costs in the trial and appellate courts; Plaintiff is accordingly entitled to $1,350,000.00 plus costs and attorneys' fees.

83.    In accordance with Fla. Stat. §772.11, Plaintiff simultaneously with the filing of this Complaint, provided Defendants with the condition precedent written demand.  See copy of demand attached hereto and made a part hereof as Exhibit "D."

WHEREFORE, Plaintiff, Iron Bridge Tools, Inc. respectfully requests the entry of judgment against Defendants, (i) jointly and severally, for damages in accordance with Fla. Stat. §772.11; (ii) together with costs, attorneys' fees and interest; and (iii) granting any other and further relief this Court deems just and proper.

## COUNT VIII - CONTRACT IMPLIED IN LAW – ALL DEFENDANTS

84.    Plaintiff hereby re-alleges every allegation in paragraphs 1 through 35 as if fully set forth herein..

85.    Plaintiffs conferred a benefit on Defendants in the form of the sum of $450,000.00.

86.    Defendants accepted and retained the benefits conferred by Plaintiff.

87.    The circumstances are such that it would be inequitable for Defendants to retain

benefit without paying fair value for it.

WHEREFORE, Plaintiff, Iron Bridge Tools, Inc. respectfully requests the entry of judgment against Defendants, (i) jointly and severally, for damages in excess of $15,000.00; (ii) together with costs and interest, and (iii) granting any other and further relief this Court deems just and proper..

## COUNT IX - CLAIM FOR CIVIL CONSPIRACY - ALL DEFENDANTS

88.     Plaintiff hereby re-alleges every allegation in paragraphs 1 through 35 as if fully set forth herein..

89.     Plaintiff sues all Defendants for Civil Conspiracy.

90.     Based upon the facts set forth herein, Plaintiffs allege there was an agreement between the Defendants to essentially obtain the $450,000.00 from Plaintiff.

91.     As set forth above, there occurred at least one (1), if not several overt acts in pursuance of the conspiracy by the Defendants.

92.     Plaintiff has  been damaged as a result of the acts done under the conspiracy

**[THIS SPACE INTENTIONALLY LEFT BLANK]**

**WHEREFORE**, Plaintiff, Iron Bridge Tools, Inc. respectfully requests the entry of judgment against all Defendants (i) finding a civil conspiracy; (ii) causing all Defendants to be jointly and severally liable for all damages under this Complaint, and (iii) granting any other and further relief this Court deems just and proper..

Dated:  September 30, 2016

> RICE PUGATCH ROBINSON STORFER & COHEN PLLC
> Counsel for the Debtor in Possession
> 101 NE 3rd Ave., Suite 1800
> Fort Lauderdale, FL 33301
> Telephone:    (954) 462-8000
> Facsimile:    (954) 462-4300
>
> By: /s/ Craig A. Pugatch
>       CRAIG A. PUGATCH
>       Florida Bar No.: 65338
>       capugatch@rprslaw.com
>       CHAD P. PUGATCH
>       Florida Bar No.: 220582
>       cpugatch@rprslaw.com

J:\WPDocs\5815.001 Iron Bridge Tools\Adv Pro\IBT Adversary Complaint.docx

# ESCROW AGREEMENT

**Transaction Reference: IRON BRIDGE_CGS/111154-1**

**Eleven Pages**

1.        This Agreement (hereinafter the "Escrow Agreement" or "Agreement") is made and entered into as of this 4th day of November 2015 by and between **Iron Bridge Tools Inc.,** (hereinafter "IRON BRIDGE"), a business entity with address at 624 S. Military Trail, Deerfield Beach, Florida  by its Chief Executive Officer and authorized signatory, Mr. Glenn Robinson and **Cardinal Group Services, LLC,** (hereinafter "CARDINAL") a Nevada Limited Liability Company, with address at 100 Church Street, 8th Floor, New York, NY 10007, United States of America, by its Director and authorized signatory, David Turner. IRON BRIDGE and CARDINAL are each a "Party" and together are the "Parties" to this Escrow Agreement. **Aaron Etra, Esq.** 445 Park Avenue - 9th Floor, New York, NY 10022 is agreeing to serve as an Escrow Agent (hereinafter "Escrowee") hereunder.

2.        IRON BRIDGE and CARDINAL have entered into an Agreement of even date herewith, a copy of which is attached hereto as Schedule-A, and incorporated herein (hereinafter  the "SBLC Agreement").

3        The SBLC  Agreement provides in part:

"I.        Within 3 (three) banking days from the date of this Escrow Agreement, IRON BRIDGE shall remit the sum of $450,000.00 USD (Four Hundred and Fifty Thousand United States Dollars) (being 3% of the face amount of the SBLC) (hereinafter the "Initial Deposit") into the attorney escrow receiving account of the Escrowee pursuant to this Escrow Agreement and the SBLC Agreement."

4.        The escrow receiving account to which IRON BRIDGE shall remit the Initial Deposit by wire transfer is as follows:

BANK NAME: Capital One, N.A.

BANK ADDRESS: 750 Third Avenue, New York, Ny 10017

SWIFT NO: HIBKUS44

 ABA: 021407912

ACCOUNT NAME: Aaron Etra IOLA Account

 ACCOUNT NO: 7527287469

The Initial Deposit shall remain in the attorney escrow receiving account or  such other attorney escrow account as hall be determined by the Escrowee until distributed or refunded in accordance with the terms of this Escrow Agreement and the  SBLC Agreement.

1



5.        Within 15 (fifteen) banking days from the date of issuance of the SBLC provided for in the SBLC Agreement, IRON BRIDGE shall remit to the attorney escrow receiving account a payment of $750,000.00 USD (Seven Hundred and Fifty Thousand United States Dollars) (being 5% of the face amount of the SBLC). Within 30 (thirty) banking days prior to the end of the 12th (twelfth) month from the date of issuance of the SBLC, IRON BRIDGE shall remit to the attorney escrow receiving account a payment of $300,000.00 USD (Three Hundred Thousand United States Dollars) (being 2% of the face amount of the SBLC). The amounts stated in this paragraph shall be distributed by the Escrowee in accordance with the written instructions of CARDINAL.

6.        IRON BRIDGE and CARDINAL may require subsequent annual payments relating to the SBLC to be remitted to the said attorney escrow receiving account, in which case this Escrow Agreement may be amended, or a new agreement drafted to provide for such payments.

7.        Any claim, controversy, or difference between the Parties arising out of the performance, execution, or interpretation of this Agreement, or of any matter relating thereto, shall be finally settled by binding arbitration under UNCITRAL Rules by a single arbitrator sitting in New York, New York and applying the laws of the State of New York, without giving effect to its conflicts of laws. Any arbitration award may be entered and recorded in any Court of law, and executed upon, in any jurisdiction, by the Party to which it is awarded, without protest or modification by the Party against whom it is awarded.

8.        This Agreement embodies the entire agreement of the Parties and the Escrowee, and no representations, inducements or agreements, oral or otherwise, between the Parties and the Escrowee not contained in this Escrow Agreement shall be of any force or effect. This Escrow Agreement may not be amended or modified, waived or terminated, otherwise than as stated herein, except by a written instrument executed by the Parties and the Escrowee.

9        The unenforceability, invalidity or illegality of any provision of this Agreement shall not render the other provisions hereof unenforceable, invalid or illegal, but any unenforceable, invalid or illegal provision shall simply be stricken from the Agreement and all of the other terms and conditions of the Agreement shall remain in full force and effect.

10.       The Parties hereto hereby certify that they have read this Agreement in its entirety, have consulted with, or had the opportunity to consult with competent counsel as to the meaning and intent of the terms and conditions contained herein (or knowingly waived the opportunity to do so), execute this Agreement having complete understanding of the consequences hereof, and, if appropriate, are in possession of appropriate corporate resolutions authorizing them to execute and enter into this Agreement.

11.       The Parties agree and acknowledge that this Agreement is the result of their mutual efforts and that they are both drafters of this Agreement, and that no court, arbitrator or other adjudicating entity shall construe the terms of this Agreement against either Party as a result of its authorship.

12.       This Agreement may be executed in one or more counterparts, each of which shall be

deemed an original and all of which shall constitute one and the same Agreement. A signature on this Agreement delivered by e-mail or other artificial means shall be deemed valid.

13.     This will confirm that the Escrowee has been advised that CARDINAL will be paying forthwith $5,000 representing Escrowees initial fee, in accordance with the fee agreement between CARDINAL and Escrowee, and will acknowledge receipt when the same has been received into Escrowee's bank.

14.     All notices, requests, demands or other communications under this Escrow Agreement shall be in writing , sent by email transmission, with written confirmation mailed by first class, prepaid ,  registered airmail, to the addresses listed below, or such other addresses as ahall be notified pursuant hereto,and shall be effective  on the fifth business day after the confirmation has been mailed.

15.     The Escrowee is not a Party to this Escrow Agreement or the SBLC Agreement, is acting as a depository only, and is not responsible or liable in any manner whatsoever to any Party or other person or entity for the sufficiency, correctness, validity or genuiness of the funds, the SBLC or any other aspect of the transactions contemplated by this Agreement or the SBLC Agreement.

16.     The Escrowee shall not be required to take or be bound by notice of any default of any person, including but not limited to a Party, or to take any action with respect to such default, whether or not such action involves any expense or liability.

17.     The  Parties hereby indemnify and hold the Escrowee fully harmless against and for any loss, liability, damages, costs or expenses, including reasonable attorney's fees, related in any way to the performance of Escrowee hereunder or to action or omission by any Party.

18.     The Escrowee shall not be liable for any error of judgment or for any act done or step taken or omitted, or for any mistake of fact or law or for or for anything which Escrowee may do or refrain from doing in connection herewith, except for Escrowee's gross negligence or willful misconduct. The Escrowee's duties are only to the Parties and only pursuant to this Agreement.

19.     In Escrowee's sole discretion, he can consult with counsel and bring to a court of his choosing, any matter he wishes arising from his responsibilities hereunder, and take any action necessary or resulting therefrom. Any fees, expenses or costs of so doing, or of taking any action he deems necessary , including his own fees and expenses, shall be a first call on the funds or any other property of the Parties, required to meet what is called-for hereunder.

The foregoing is agreed to and is being executed by duly authorized representatives of the Parties and is legally binding on them and effective as of the date first above written.

**EXECUTION ON FOLLOWING PAGE**

3

**IRON BRIDGE TOOLS, INC**

By: _____

GLENN ROBINSON Chief Executive Officer and Authorized Signatory

Address: 624 S. Military Trail, Deerfield Beach, FL 33442
Email: glenn@ironbridgetools.com

**CARDINAL GROUP SERVICES, LLC**

By: _____

DAVID TURNER, Director and Authorized Signatory

Address: 100 Church Street, 8th Floor, New York, NY 10007
Email: turnerdavid7@gmail.com

Agreed as to solely for serving as Escrowee pursuant to the terms and conditions above written:

By: _____

Aaron Etra, Esq.

Address: 445 Park Avenue- 9th Floor
Email: aaron@etra.com

4



**Cardinal Group Services, LLC**
"Building Futures One Block at a Time"

# AGREEMENT

**Transaction Reference: IRON BRIDGE_CGS/111154-1**

**(Six Pages)**

This Agreement (hereinafter the "Agreement") is made and entered into this 4th day of November 2015 by and between **Iron Bridge Tools Inc.,** (hereinafter "IRON BRIDGE"), a Florida corporation, with address at 624 S. Military Trail, Deerfield Beach, Florida 33442, by its Chief Executive Officer and authorized signatory Mr. Glenn Robinson, and **Cardinal Group Services, LLC,** (hereinafter "CARDINAL"), a Nevada Limited Liability Company, with address at 100 Church Street, 8th Floor, New York, NY 10007, United States of America, by its Director and authorized signatory David Turner. IRON BRIDGE and CARDINAL are referred to collectively herein as the "Parties" and in the singular as "Party".

## RECITALS

IRON BRIDGE wishes to acquire a Stand By Letter of Credit in the face amount of $15,000,000.00 USD (Fifteen Million United States Dollars) (hereinafter the 'SBLC") on the terms and conditions set forth below.

CARDINAL represents that it has through its banking and other relationships, the ability to provide the SBLC on the terms and conditions set forth below.

Each party represents that neither it nor any officer or person associated with it is in any way relying upon the United States Securities Act of 1933 or related regulations, and that the transaction or transactions referred to herein do not involve the purchase or sale of securities registered in the United States of America.

Each Party further represents that neither it nor any of its agents or employees is a licensed broker dealer, banker, or government agent or employee, and that it has in no manner been solicited by the other Party or any of its affiliates, subsidiaries or any person acting in conjunction

5

therewith with respect to the subject matter of this Agreement or any other matter.

**NOW THEREFORE, in consideration of the premises and mutual covenants hereinafter contained and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:**

1.   The terms of the SBLC shall be for one year and one day, with rolls and extensions to a total of thirty six (36) months from its date of issuance, the fees for which shall be remitted as follows:

   **A.   YEAR ONE**

   I.      Within 3 (three) business days from the date of this Agreement, IRON BRIDGE shall remit the sum of $450,000.00 USD (Four Hundred and Fifty Thousand United States Dollars) (being 3% of the face amount of the SBLC) (hereinafter the "Initial Deposit") into the attorney escrow IOLTA account (hereinafter the "Escrow Account"), of Aaron Etra, Esq., 445 Park Avenue - 9th Floor, New York, NY 10022 (hereinafter the "Escrow Attorney") pursuant to a separate agreement between IRON BRIDGE, CARDINAL and the Escrow Attorney. All fees charged by the Escrow Attorney for the use of the said IOLTA account shall be borne solely by CARDINAL, and IRON BRIDGE shall have no responsibility therefore.

   II.     Upon receipt of the Initial Deposit into the Escrow Account CARDINAL shall ensure that bank to bank communication is effected between the Issuing bank and the Receiving bank, and that all standard documentation is provided by the Issuing bank to the satisfaction of the Receiving bank.

   III.    CARDINAL shall cause the Issuing bank to issue the Swift pre-advice, referred to in paragraph-1, A, III, below, to the Receiving bank within 3 (three) banking days from receipt of the Initial Deposit into the Escrow Account. The Initial Deposit shall remain in attorney escrow custody until the SBLC is delivered to received, verified, and authenticated at the banking coordinates that IRON BRIDGE shall specify to CARDINAL in writing, at which time the Initial Deposit shall be deemed earned and non-refundable. In the unlikely event that the SBLC does not issue, the Initial Deposit shall be returned by escrow attorney to IRON BRIDGE less any reasonable banking fees, and costs that may have been incurred within 21-days from its receipt into the attorney escrow.

   IV.    Prior to the issuance of the MT760, The issuing bank will communicate, via Swift pre-advice, with the receiving bank, and will only issue the MT760 upon satisfactory communication from the receiving bank that it is ready to receive the MT760. CARDINAL shall ensure that the MT760 is issued within 3 (three) banking days from receipt of said communication from the receiving bank. A copy of the Swift pre-advice, the delivered MT-760 and Swift receipt shall be emailed by CARDINAL to IRON BRIDGE.

   V.     Within 15 (fifteen) banking days from the date of delivery and receipt of the SBLC, IRON BRIDGE shall remit a payment of $750,000.00 USD (Seven Hundred and Fifty Thousand United States Dollars) (being 5% of the face amount of the SBLC).

   VI.    Within 30 (thirty) days prior to the end of the 12th (twelfth) month from the date of issuance of the SBLC, IRON BRIDGE shall remit a payment of $300,000.00 USD (Three Hundred

Thousand United States Dollars) (being 2% of the face amount of the SBLC).

**B.    YEAR TWO**

I.    If, at the beginning of the new term, IRON BRIDGE desires to renew the SBLC, it shall remit a payment of $300,000.00 USD (Three Hundred Thousand United States Dollars) (being 2% of the face amount of the SBLC), followed by a payment of $900,000.00 USD (Nine Hundred Thousand United States Dollars) (being 6% of the face amount of the SBLC), which IRON BRIDGE shall remit within ten (10) banking days thereof.

**C.    YEAR THREE**

1.    If, at the beginning of the new term, IRON BRIDGE desires to renew the SBLC, shall remit a payment of $300,000.00 USD (Three Hundred Thousand United States Dollars) (being 2% of the face amount of the SBLC), followed by a payment of $750,000.00 USD (Seven Hundred and Fifty Thousand United States Dollars) (being 5% of the face amount of the SBLC), which IRON BRIDGE shall remit within ten (10) banking days thereof.

2.    IRON BRIDGE agrees that it will use the SBLC for the sole purpose of credit enhancement to be added on its balance sheet, to assist in the granting of certain credit facilities from IRON BRIDGE's designated financial institutions.

3.    IRON BRIDGE agrees that, if requested to do so, it will make available all books and records from time to time to allow for verification of the actual sales or other activity occurring on a monthly basis, or provide access to a verifiable audit trail for sales.

4.    IRON BRIDGE agrees that a recorded lien may be required against certain business assets and assignment of certain contracts in possession of IRON BRIDGE; however, such lien and/or assignment shall be subordinate to any lien that may be created against the assets of IRON BRIDGE by Hanmi Bank.

5.    IRON BRIDGE agrees that the issuance of the SBLC is conditional upon the satisfactory completion of all due diligence that may in CARDINAL's sole discretion be required.

6.    CARDINAL shall at all times attempt to restrict costs and expenses incurred in connection with the underwriting of this transaction; however, if any such costs arise CARDINAL may pass them on to IRON BRIDGE, in which case the issuance of the SBLC shall be subject to CARDINAL's receipt thereof. The amount of such costs shall be restricted to a maximum of $1,500.00 USD (One Thousand Five Hundred United States Dollars). If any additional services are requested by IRON BRIDGE that are not part of the underwriting of this transaction, the costs therefore shall not be limited to the said $1,500.00 USD (One Thousand Five Hundred United States Dollars).

7.    The issuance of the SBLC shall be in accordance with the form and content set forth in "Schedule-A" to this Agreement. The SBLC shall be issued from one (1) of the following banks:

HSBC (LONDON & HONG KONG)
BANK OF AMERICA
STANDARD CHARTERED BANK

CITIBANK (NEW YORK & LONDON)
BBVA
SANTANDER (SPAIN)
CHASE BANK

or other top-50 world bank.

8. This agreement creates a joint venture between the Parties pursuant to which each Party brings its knowledge, expertise, contacts and/or funding. No new entity is created, either explicitly or impliedly by this Agreement, and no new entity is created or shall be deemed to arise from the Parties conduct in carrying out or attempting to carry out its terms and conditions. The standard of performance of the Parties hereunder is one of best efforts. Except as otherwise provided herein, neither Party shall be liable to the other providing that such standard has been met, and no fiduciary relationship exists or shall arise between them, either explicitly or impliedly.

9. IRON BRIDGE hereby authorizes CARDINAL, after written notice to IRON BRIDGE, to execute any and all documents on its behalf or in its stead that CARDINAL would sign if obtaining the SBLC as a principal for its own use; however, CARDINAL shall not execute any document that would extend IRON BRIDGE's liability or obligation beyond the scope of this Agreement.

10. Except as required by law, neither Party shall disclose this Agreement or its substance, either publicly or privately, to any person or entity, except those with whom it is in a confidential relationship, such as its lawyers and accountants, and the same agree to maintain such standard of non-disclosure.

11. During the Parties' interactions they may discover or disclose confidential information (hereinafter "Confidential Information") to each other. Such Confidential Information includes, but is not necessarily limited to, the identity of banks, bankers, attorneys, their agents, associates, and related institutions and professionals, but shall exclude information already known to either of the Parties prior to their interactions. The Parties agree that all such Confidential Information is proprietary and of great value, acquired at great cost and with great time and effort and each Party hereby agrees that it will not disclose any such Confidential Information either directly or indirectly to any third-party whatsoever and shall not profit or enter into any relationship with any person or entity constituting Confidential Information with the intent of profit without the express written consent of the owner of such Confidential Information. The provisions of this paragraph shall run for a period of sixty-(60)-months from the date of this Agreement and the Parties agree that such period is fair and reasonable. In the event of a breach of this covenant by either of the Parties, the other shall be entitled to monetary damages in addition to injunctive or other equitable relief. The provisions of this paragraph shall survive the termination of this Agreement.

12. Any claim, controversy, or difference between the Parties arising out of the performance, execution, or interpretation of this Agreement, or of any matter relating thereto, shall be settled by binding arbitration with the American Arbitration Association with jurisdiction and venue at the

8

option of the complaining Party (confined to New York and Florida). In the interest of a speedy resolution to any dispute that may arise, the Parties waive the right to discovery. Any arbitration award may be entered and recorded in any Court of law, and executed upon, in any jurisdiction, by the Party to which it is awarded, without protest or modification by the Party against whom it is awarded.

13. This Agreement embodies the entire agreement of the Parties and no representations, inducements or agreements, oral or otherwise, between the Parties not contained in this Agreement shall be of any force or effect. This Agreement may not be amended or modified, waived or terminated, otherwise than as stated herein, except by a written instrument executed by the Parties.

14. Each of the Parties is a sophisticated businessperson or entity and understands that there are potential risks and rewards associated with all business ventures, including the business venture or business ventures that is/are the subject of this Agreement, the potential risks and rewards of which each Party agrees to accept.

15. The unenforceability, invalidity or illegality of any provision of this Agreement shall not render the other provisions hereof unenforceable, invalid or illegal, but any unenforceable, invalid or illegal provision shall simply be stricken from the Agreement and all of the other terms and conditions of the Agreement shall remain in full force and effect.

16. IRON BRIDGE shall not permit the SBLC to be called or cashed, and agrees to indemnify, defend and hold CARDINAL harmless from all damages, costs, expenses, and attorney fees whatsoever, arising from any breach by it of this Agreement or of any use by it of the SBLC not contemplated or permitted herein.

17. The Parties hereto hereby certify that they have read this Agreement in its entirety, have consulted with, or had the opportunity to consult with competent counsel as to the meaning and intent of the terms and conditions contained herein (or knowingly waived the opportunity to do so), execute this Agreement having complete understanding of the consequences hereof, and, if appropriate, are in possession of appropriate corporate resolutions authorizing them to execute and enter into this Agreement.

18. The Parties agree and acknowledge that this Agreement is the result of their mutual efforts and that they are both drafters of this Agreement, and that no court, arbitrator or other adjudicating entity shall construe the terms of this Agreement against either Party as a result of its authorship.

19. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement. A signature on this Agreement delivered by e-mail or other artificial means shall be deemed valid.

The foregoing is agreed to and is effective commencing this 4th day of November 2015:

**EXECUTION ON FOLLOWING PAGE**

9

**IRON BRIDGE TOOLS, INC**

By: _____
     GLENN ROBINSON Chief Executive Officer and Authorized Signatory

**CARDINAL GROUP SERVICES, LLC**

By: _____
     DAVID TURNER, Director and Authorized Signatory

1

# SCHEDULE-A

| | | |
|---|---|---|
| ADVISING BANK | : | HANMI BANK, CORPORATE BANKING CENTER |
| SWIFT CODE | : | HANMUS6L |
| DATE OF ISSUE | : | |
| LETTER OF CREDIT NO. | : | |
| AMOUNT | : | XXX USD |
| APPLICANT NAME | : | |
| ADDRESS | : | |
| BENEFICIARY | : | HANMI BANK |
| | | CORPRATE BANKING CENTER |
| | | 933 VERMONT AVE. 2nd FLOOR |
| | | LOS ANGELES, CA 90006 |

WE HEREBY ISSUE OUR IRREVOCABLE STANDBY LETTER OF CREDIT (INSERT NUMBER) IN FAVOR OF HANMI BANK, CORPORATE BANKING CENTER, 933 VERMONT AVE. 2nd FLOOR, LOS ANGELES 90006 FOR THE ACCOUNT OF (INSERT APPLICANT'S NAME AND ADDRESS) UP TO THE AGGREGATE AMOUNT OF USD (IN NUMBER) (USD IN WORDING) AS A SECURITY FOR THE LINE OF CREDIT EXTENDED BY HANMI BANK TO (INSERT BORROWER'S NAME AND ADDRESS).

THIS STANDBY LETTER OF CREDT IS TO BE AVAILABLE BY PAYMENT AT SIGHT WITH HANMI BANK'S AUTHENTICATED SWIT/TELEX MESSAGE STATING THAT THIS CLAIM REPRESENTS THE OUTSTANDING LOAN AND ACCRUED INTEREST (INSERT BORROWER'S NAME AND ADDRESS) OWES TO HANMI BANK UNDER THE LINE OF CREDIT SECURED BY THE STANDBY LETTER OF CREDIT (INSERT L/C NO.)

THIS STANDBY LETTER OF CREDIT WILL EXPIERE ON (ONE YEAR AND ONE DAY FROM THE DATE OF ISSUANCE), AFTER WHICH DATE THIS STANDBY LETTER OF CREDIT WILL BECOME NULL AND VOID; HOWEVER, THIS STANDBY LETTER OF CREDIT IS EXTENDABLE FOR SUBSEQUENT PERIODS OF EQUAL DURATION, AND WILL NOT BECOME NULL AND VOID DURING SUCH PERIODS IF SO EXTENDED.

MULTIPLE DRAWINGS ARE NOT ALLOWED.

WE CONFIRM THAT WE WILL MAKE AN UNCONDITIONAL PAYMENT WITHIN 3 BANKING DAYS FROM THE DATE OF OUR RECEIPT OF THE CLAIM UNDER THIS STANDBY LETTER OF CREDIT. IN CASE THE PROCEEDS OF THE CLAIM ARE NOT AVAILABLE TO THE BENEFICIARY WITHIN 4 BANKING DAYS FROM OUR RECEIPT OF THE CLAIM, A DELAY CHARGE AT WALL STREET JOURNAL PRIME PLUS 2 PERCENT PER ANNUM WILL BE PAID EVEN THOUGH THE COMBINED AMOUNT OF THE CLAIM AND THE DELAY CHARGE EXCEEDS THE AMOUNT OF THE STANDBY LETTER OF CREDIT.

THIS LETTER OF CREDIT SHALL STATE THAT IT IS SUBJECT TO THE INTERNATIONAL STANDBY PRACTICES (1998) ("ISP98"), INTERNATIONAL CHANGER OF COMMERCE PUBLICATION NO. 590. AS TO MATTERS NOT COVERED BY ISP98, THIS LETTER OF CREDIT SHALL BE SUBJECT TO AND GOVERNED BY THE LAWS OF THE JURISDICTION OF THE ISSUING BANK.

1

| | |
|---|---|
| **From:** | Aaron Etra |
| **To:** | Frank Smith |
| **Subject:** | RE: Signature Page for Iron Bridge- Cardinal Escrow Agreement |
| **Date:** | Tuesday, November 10, 2015 5:45:28 PM |

You are very welcome, Frank.

Yes, I have just checked the account and the deposit has now been completed.

Best,

Aaron Etra, Esq.

**From:** Frank Smith [mailto:frank.smith@fmslawyer.com]
**Sent:** Tuesday, November 10, 2015 5:13 PM
**To:** Aaron Etra
**Subject:** RE: Signature Page for Iron Bridge- Cardinal Escrow Agreement

Thank you.  I understand that the complete deposit amount has been received at this time.  Please confirm.

Best regards,

Frank Smith, Esq.

FMS Lawyer PL
9900 Stirling Road, Suite 226
Cooper City, Florida 33024
Tel. 954-985-1400
Fax. 954-241-6947
frank.smith@fmslawyer.com
www.fmslawyer.com

STATEMENT OF CONFIDENTIALITY AND PRIVILEGE AND TAX ADVICE
The information contained in this e-mail communication may be confidential and privileged. It is intended only for the use of the individual or entity identified. If you are not the intended recipient, please do not disseminate, distribute, or copy. Instead, please notify us at 954-985-1400 and immediately delete this message.

Pursuant to Internal Revenue Service Circular 230, we are required to advise you that if there is any tax advice contained in this email, it was neither written nor intended by the sender or this firm to be used, and cannot be used, by the addressee, recipient, or any taxpayer, for the purpose of avoiding penalties that may be imposed by or under United States law, including but not limited to the Internal Revenue Code.

**From:** Aaron Etra [mailto:aaron@etra.com]
**Sent:** Tuesday, November 10, 2015 3:08 AM
**To:** Frank Smith



EXHIBIT

B

**Subject:** Signature Page for Iron Bridge- Cardinal Escrow Agreement

Dear Frank,

Please find attached my signature page for the Escrow Agreement.

Best,

Aaron

Aaron Etra, Esq.
445 Park Avenue- 9th Floor
New York, NY 10022
Tel. +1-917-856-3500



**Cardinal Group Services, LLC**
"Building Futures One Block at a Time"

# AMENDMENT TO AGREEMENT

**Transaction Reference: IRON BRIDGE_CGS/111154-1**

**(Three Pages)**

This Amendment to Agreement (hereinafter the "Amendment") is made this 15th day of December, 2015 by and between **Iron Bridge Tools Inc.,** (hereinafter "IRON BRIDGE"), by its Chief Executive Officer and authorized signatory Mr. Glenn Robinson, and **Cardinal Group Services, LLC,** (hereinafter "CARDINAL"), by its Director and authorized signatory David Turner, and constitutes a valid written amendment to that agreement (hereinafter the "Agreement") made and entered into by IRON BRIDGE and CARDINAL on November 4th 2015.

IRON BRIDGE and CARDINAL are referred to collectively herein as the "Parties" and in the singular as "Party".

## RECITALS

In working with CARDINAL's business relationships during the course of the joint venture described in the Agreement, the Parties discovered a way to move forward with the financing for the business requirements of IRON BRIDGE that was more beneficial to IRON BRIDGE than that described in the Agreement, and the Parties now wish to amend the Agreement accordingly.

In hereby amending the Agreement, the Parties wish to emphasize that they are pleased with the professionalism of each other, that they enjoy doing business with each other, and look forward to working with each other as IRON BRIDGE grows and develops in the months and years ahead. Nothing herein shall be taken to indicate any displeasure of one Party with the other, or any rift between them whatsoever; the sole reason for this Amendment being the benefit of IRON BRIDGE. The principals of IRON BRIDGE and CARDINAL also take this opportunity to express their warm regards to each other, and look forward to an ongoing business and personal relationship.

**NOW THEREFORE, in consideration of the premises and mutual covenants hereinafter contained and for other good and valuable consideration the receipt and sufficiency of which is**

Amendment to Agreement between Iron Bridge Tools and Cardinal Group Services, LLC



EXHIBIT
C

**hereby acknowledged, the Parties agree as follows:**

1.       During the course of the joint venture described in the Agreement, CARDINAL introduced IRON BRIDGE to Equity Capital Partners (hereinafter "ECP"), with which CARDINAL has a close and ongoing business relationship. CARDINAL was pleased to make the introduction, which was made for the benefit of IRON BRIDGE.

2.       CARDINAL is very pleased with the results of that introduction, and henceforth, IRON BRIDGE may, therefore, communicate directly with ECP, without the requirement for the further permission, assistance, or input of CARDINAL.

3.       ECP would otherwise constitute "Confidential Information", as described in paragraph-11 of the Agreement, precluding IRON BRIDGE from entering into any further business relationships with it; however, CARDINAL is hereby very pleased to agree that ECP shall be excluded from the definition of "Confidential Information" in the Agreement, and that IRON BRIDGE may, therefore, enter into further business relationships with it.

4.       As a result of interaction between IRON BRIDGE, ECP, and CARDINAL, and the developing and growing needs of IRON BRIDGE, it was decided that the obligation of CARDINAL to provide an SBLC, should be upgraded and enhanced to a direct credit facility from ECP to IRON BRIDGE. The Parties are pleased to say that ECP will now work directly with IRON BRIDGE at IRON BRIDGE's business location to develop and structure IRON BRIDGE's business model, in an ongoing joint business relationship. All CARDINAL's duties and obligations under the Agreement have now been satisfactorily concluded, and IRON BRIDGE is under no further obligation or duty to make the additional payments described in numbered paragraph-1(A)(V)&(VI) of the Agreement. Any further costs or expenses to IRON BRDIGE as it moves forward with its relationship with ECP shall be identified and outlined in a written agreement between IRON BRDIGE and ECP, to which CARDINAL shall not be a party. CARDINAL is very excited for IRON BRIDGE and its new relationship with ECP; however, nothing stated in the foregoing shall preclude the development of an additional, ongoing relationship between IRON BRIDGE and CARDINAL, to which both of the Parties look forward.

5.       IRON BRIDGE understands, agrees, and is pleased that in moving forward with its credit facility, ECP is requiring the funds escrowed under its Agreement with CARDINAL to be released forthwith, in order to secure assets to establish and cross collateralize the said credit facility. CARDINAL has agreed with ECP that it will provide its expertise and assistance in this regard, IRON BRIDGE hereby agrees that the said funds may be released from escrow, and the escrowee is hereby instructed accordingly.

6.       The Parties agree that ECP shall provide IRON BRIDGE directly with documentation pertaining to the said assets used to establish and cross collateralize IRON BRIDGE's credit facility within 5 days, and that in the unlikely event that ECP does not grant the said credit facility, it shall promptly reimburse and return all funds, whether utilized or not utilized, directly to IRON BRIDGE.

7.       The confidentiality provisions of the Agreement shall remain in force and effect, and if IRON BRIDGE, or any of its agents or employees, believes that any third-party may benefit from the services of ECP, IRON BRIDGE shall kindly refer such third-parties to CARDINAL and not to ECP.

Amendment to Agreement between Iron Bridge Tools and Cardinal Group Services, LLC

8.    The Parties are pleased to have satisfactorily concluded their joint-venture, and look forward to entering into other mutually beneficial joint-ventures in the future through IRON BRIDGE's growth and expansion.

The foregoing is agreed to and is effective commencing this 15th day of December 2015:

**IRON BRIDGE TOOLS, INC**

By:    _____

GLENN ROBINSON Chief Executive Officer and Authorized Signatory

**CARDINAL GROUP SERVICES, LLC**

By:    _____

DAVID TURNER, Director and Authorized Signatory

The foregoing is understood and agreed to:

**EQUITY CAPITAL PARTNERS**

_____

JALEEL H. LEWIS, Managing Partner

| | |
|---|---|
| **From:** | Frank Smith |
| **To:** | Aaron Etra (aaron@etra.com); don.ramsey@cgs1.us; drcardinalgroup8@gmail.com; turnerdavid7@gmail.com |
| **Cc:** | Glenn Robinson (glenn@ironbridgetools.com) |
| **Subject:** | Iron Bridge Missing $450k Escrow Deposit |
| **Date:** | Tuesday, February 02, 2016 6:13:00 PM |

Perhaps it is time to review the history of this transaction and the escrow, so certain of the recipients of this email can stop living in fantasyland:

**On November 10, 2015** the escrow agreement was finally and fully executed. By that same day, the full $450,000.00 was received from Iron Bridge and $5,000.00 was received from Cardinal to pay the escrow agent's fee.

**On November 18, 2015** I wrote to everyone involved:

Gentlemen:

It is now almost the close of business on Wednesday, East Coast time. I understood that by this time we would have completed the banking due diligence and Hanmi would have informed me that AML, KYC and NCO had been completed. We would have also anticipated receiving the pre-advice by this time.

I must now respectfully demand that I be put in contact with opposing counsel to address the status of the deal. We are running short on time and need to understand the intentions of the Hedge Fund.

Presuming that Cardinal and the Hedge Fund have counsel, please do not respond substantively to me directly, but please ensure that I receive contact information for counsel immediately.

I have also copied the escrow agent on this email as a matter of course, but understand he does not represent Cardinal and is away until Friday in any event.

**On November 19, 2015**, I wrote to everyone involved:

Mr. Turner:

While several of the "facts" stated in your email are simply not true, I understand that much of this information was relayed to you by the others on this email chain. I am a practical man, and as such, there is no need to discuss how we arrived at the current position; only if we can move forward from this point. Note that, I have been in the loop since the very beginning and am both an officer and authorized signature for Iron Bridge Tools, Inc. Here is the situation from my end:

1. Hamni Bank has rescheduled the closing from November 16, 2015 to November 25, 2015.
2. Hamni has indicated to me that it does not use formal bank commitments and instead goes from an LOI directly to a loan agreement. I can represent to you that the "draft" you were exhibited was negotiated and agreed with Hamni and "blessed" by their outside closing counsel who has been retained for this transaction since the drafting of the loan agreement.
3. Iron Bridge has responded to all of Hamni's requests and satisfied same as of today, with the exception of any issues surrounding the SBLC.
4. We now have five (5) banking days to receive the instrument, and my only concern is how do we accomplish this in a timely manner.

If you prefer to have the communication without all of the other parties involved then I am sure we



can talk directly and there will be no objection.

While I understand you may not have any new information, I must raise one issue. Please advise me what steps we may take to get the KYC, AML and NCO documentation to Hamni as this is of paramount importance to Hanmi and is presently a pressing concern.

In addition, I have been a lawyer for a substantial period of time, (although not as long as the esteemed Mr. Etra) and I am available to certify any of the facts concerning the relationship between Iron Bridge and Hamni; so, if the subject Hedge Fund has any concerns, I can belay those as necessary.

And again, please feel free to communicate with me directly if you prefer. My contact information is below and my cell phone is 305-761-3940.

**On November 23, 2015**, I questioned the whereabouts of the escrow via phone call and follow-up email from me to Mr. Etra:

Aaron:

I remain perplexed by our conversation and your indication that you are a neutral and cannot share information. Further confusing is your below-reference to paragraph 5 of the escrow agreement, which only becomes relevant once the SBLC is issued. So in an effort to alleviate any concerns, I will be abundantly clear:

1. The Escrow Agreement provides the $450k Initial Deposit will be held in escrow pursuant to the SBLC Agreement;

2. The SBLC Agreement provides:

   "The Initial Deposit shall remain in attorney escrow custody until the SBLC is delivered to received, verified, and authenticated at the banking coordinates that IRON BRIDGE shall specify to CARDINAL in writing, at which time the Initial Deposit shall be deemed earned and non-refundable. In the unlikely event that the SBLC does not issue, the Initial Deposit shall be returned by escrow attorney to IRON BRIDGE less any reasonable banking fees, and costs that may have been incurred within 21-days from its receipt into the attorney escrow;"

3. As you are aware, under 22 N.Y.C.R.R. Part 1200, Rule 1.15(c)(3), Iron Bridge Tools, Inc. must be rendered an "appropriate account" as to their Initial Deposit;

4. Under 22 N.Y.C.R.R. Part 1200, Rule 1.15(d)(1)(iv), Iron Bridge Tools, Inc. must receive a "statement" if any funds were disbursed to them or on Iron Bridge's behalf.

My sole inquiry is as to the account/statement indicating the location and disposition of the Initial Deposit of $450k. No additional comment is necessary, so please advise me in accordance with the applicable rules.

And to tell you the truth, I was not nervous until we spoke, so please belay my concerns.

Thank you.

**On November 30, 2015**, I notified everyone that the escrow was required to be returned to Iron Bridge:

Gentlemen:

I thought it prudent to email Mr. Etra, inasmuch as tomorrow is the twenty-first (21st) day from the completion of the initial deposit and the instrument has not issued. Mr. Etra please advise where (absent us all extending the escrow agreement tomorrow), you are intending to return the funds to Iron Bridge (in essence, please confirm you have proper wiring instructions on where to return the funds).

Mr. Etra, please advise us all accordingly.

In addition, in anticipation of the presumed need to execute updated documents tomorrow, what is everyone's availability throughout the day, eastern time?

Please let us all not delay in addressing this email, because the escrow agreement was written in such a way that there is no choice but for Mr. Etra to ensure that Iron Bridge receives the funds tomorrow. And if the escrow were to break, I fear for the viability of this transaction.

**On November 30, 2015**, Cardinal confirmed that the funds would remain in escrow "until project completion." (Note the project is still not complete).

**On December 1, 2015**, Mr. Etra breached the terms of the escrow agreement by failing to return the funds to Iron bridge as he was contractually and ethically bound to do.

**Between December 2, 2015 and December 17, 2015**, Cardinal initially attempted to forbid Glenn from using his counsel and thwarted all attempts to verify the whereabouts of the escrowed funds. Then Cardinal coerced Iron Bridge to amend the agreement between Cardinal and Iron Bridge.

**On December 17, 2015**, an amendment to the agreement between Cardinal and Iron Bridge was partially executed; noting said agreement was never fully executed. Leaving aside the issue of whether the amendment was ever properly executed, there are several issues:

- The amendment was never executed by ECP and ECP never agreed with the terms or otherwise performed the required actions.
- The Escrow Agent did not sign the document and as such, was not entitled to follow the instructions. Note that the escrow agent provided in his agreement in paragraph 8 that there could be no effective amendment without him being a party to the agreement; which in this case, he was not. That language was provided by the escrow agent, not Iron Bridge.
- The amendment does not even suggest that Cardinal would be receiving any funds.
- The amendment does not even suggest that the requirement to return all funds to Iron Bridge would be waived.
- Any additional fees were capped at $1,500.00 and then only as a condition to issue the SBLC.
- The language "ECP is requiring the funds issued under its Agreement with CARDINAL to be released forthwith, in order to secure assets to establish and cross collateralize the said credit facility," appears to refer to an agreement between ECP and Cardinal, but in any event, does not allow a release of any escrowed funds to anyone other than Iron Bridge.
- The amendment provides that to the extent any funds would be required by ECP, they would within five (5) days, and before receiving any money, enter into a new escrow agreement with Iron Bridge; this was never done to this date.

From that point forward, Iron Bridge understood its $450,000.00 would either be in escrow with

the escrow agent, or upon a new escrow agreement with ECP, would be in escrow with them. As the escrow agent never provided the legally required notices as per my November 23, 2015 email above, there was no possible scenario where the money could have legally been released from escrow.

**As of February 2, 2016**, Cardinal and the escrow agent have informed Iron Bridge as follows:

- Without any justification, Cardinal believed it was entitled to a "fee" of $450,000.00. Cardinal indicated to Iron Bridge that without further explanation, it paid $300,000.00 to the hedge fund (presumably ECV), but that it was "delighted" to have received $150,000.00 for doing absolutely nothing.
- Mr. Etra has indicated to Iron Bridge that, "the last information I had was an indication that you and he had agreed on a revised application of the funds," without further explanation. Clearly this is not a legal basis to release the funds.
- Now, Mr. Etra has indicated that laughably, he is relying on paragraph 5 of the amendment as discussed above; which also, does not allow any funds to be delivered to anyone other than Iron Bridge.
- And if the above were not enough, Mr. Etra indicated he gratuitously paid himself an additional $10,000.00 of Iron Bridge money, noting his fees were to be paid by Cardinal and were capped in the agreement.

So, I can tell you I am truly perplexed at this point. In my lengthy career I have seen some shocking things, but never so much so as these events:

- Cardinal admits stealing $450,000.00 from Iron Bridge, but tells Iron Bridge that it should be glad as they had to work really hard for it… oh' and while Cardinal gave $300,000.00 to the "hedge fund" without explanation , not to worry as they are "delighted" to have stolen only $150,000.00.
- Mr. Ramsey seemed genuinely surprised that Iron Bridge has not seen one dollar of funding at this time, but did not suggest that he would return the stolen funds.
- Mr. Etra still cannot explain why he delivered the escrow to Cardinal, but candidly admits he was paid an additional $10,000.00 by Cardinal in consideration of giving them Iron Bridge's money.
- And in response to my questions, and the legal demands I made, I am essentially called stupid; and the above admitted "facts" are called "unfounded allegations" by Mr Etra.

At this time, this is very simple, if the $450,000.00 is not in Iron Bridge's account by tomorrow am, then both myself and the client will take any and all legal steps available to us as a result of these reckless, grossly negligent, intentional and criminal acts. You should be aware that I did not want to send this letter, as I wanted to immediately proceed with legal and administrative action; but Glenn prevailed upon me to extend a final deadline. This is your one and only time to do the right thing, there will be no more chances…

And if the money is returned, we can do releases and more importantly for you folks, a confidentiality agreement…

Not that it matters, but if anyone believes this email is not a formal notice under the respective agreements, please advise me accordingly and I will fedex a copy of this email in letter form.

Best regards,

Frank Smith, Esq.

FMS Lawyer PL
9900 Stirling Road, Suite 226
Cooper City, Florida 33024
Tel. 954-985-1400
Fax. 954-241-6947
frank.smith@fmslawyer.com
www.fmslawyer.com

STATEMENT OF CONFIDENTIALITY AND PRIVILEGE AND TAX ADVICE
The information contained in this e-mail communication may be confidential and privileged. It is
intended only for the use of the individual or entity identified. If you are not the intended recipient,
please do not disseminate, distribute, or copy. Instead, please notify us at 954-985-1400 and
immediately delete this message.

Pursuant to Internal Revenue Service Circular 230, we are required to advise you that if there is
any tax advice contained in this email, it was neither written nor intended by the sender or this
firm to be used, and cannot be used, by the addressee, recipient, or any taxpayer, for the purpose
of avoiding penalties that may be imposed by or under United States law, including but not limited
to the Internal Revenue Code.